PRESENT—HIRAM WARNER, CHIEF JUSTICE.
H. K. McCAY, } JUDGES.
ROBERT P. TRIPPE, } JUDGES.

MOULTRIE MOSES et al., plaintiffs in error, vs. ISAAC I. MOSES, executor, defendant in error.

1. When a portion of the assets of an estate consists of an interest in a partnership of which the deceased was a member, it is the duty of an executor who knows the fact, to take notice of the claim in his inventory and return it to the Ordinary, but a failure to do this, though an act justifying suspicion, does not require the executor to be charged with the nominal value of such interest, and he may show what was its real value.

2. When, within a reasonable time after qualification, the executor has a settlement with a surviving partner of the deceased, and receives from him, as the deceased's interest, part of the assets of the partnership in kind, such settlement is to be considered *prima facie*, as a fair one, and if there be no affirmative evidence to the contrary, a jury is authorized to act upon it, as a just and proper settlement.

3. When an executor buys from a surviving partner of the deceased, an interest in the partnership, giving his own note, and subsequently takes from the surviving partner that note as part of the deceased's share in the partnership, and substitutes in his hands, as executor, for that

note, other good and well secured notes belonging to himself an an investment of the money for the estate. Such acts are not illegal, though they justify and require a close scrutiny into the good faith and *bona fides* of the transaction.

4. When the assets of an estate came into the hands of an executor in October, 1860, and were mostly in promissory notes, and the legatees were most of them citizens of New York, and the executor made no returns to the Ordinary during the war, but managed their own affairs in this State, keeping books and making entries therein of his transactions, and in 1865 made a full return of his acts to the Ordinary, and procured from him a special order, excusing his failure to make returns during the war, and allowing him his commissions :

*Held,* That a verdict of a jury is not illegal, which recognizes the executor as not in default for failing to make returns during the war, and which excuses him for losses upon investments made in good faith, and under circumstances, such as other prudent men acted in the same way.

5. Until the adoption of the Code, 1st of January, 1873, there was no particular funds or bonds in which trustees were required by law to invest, and investments made as other prudent men invested their funds, if made in good faith, will protect an executor if he be guilty of no illegality.

6. It is not improper for a jury to allow an executor reasonable counsel fees for advice and aid in the management of an estate, and making returns. But when the legatees file a bill against the executor for an account, charging a *devastavit*, it is improper and illegal to allow the executor counsel fees for defending the bill, unless it plainly appear that there are such complications and conflicting claims among those interested in the estate as to make it necessary for the interest of the parties, that the settlement should be by a decree of the Court.

Administrators and executors. Partnership. Settlement. Returns. Investments. Attorney's fees. Before Judge JAMES JOHNSON. Muscogee Superior Court. October Term, 1872.

This bill is filed by Moultrie Moses, Montefiore Moses, Flora Moses and her husband Otto L. Moses, Sarah Davega and her husband, Isaac Davega, and Felix T. Moses and Jacob Moses, minors, who sue by their next friend, Moultrie Moses, against Isaac I. Moses, executor of Jacob I. Moses, deceased.

It is charged that Jacob I. Moses died, leaving a large estate of real and personal property, and a will and codicil, by which he disposed of the same. Under this will, legacies were be-

queathed to the said Sarah, who was the widow of said Jacob I., and divers other persons. It also gave to Moultrie and Montefiore, and their brother, Rynear, a legacy of $20,000 00, and provided the same should be placed in the hands of three respectable and responsible gentlemen of New York, in trust, to be invested in the best six per cent. securities until Montefiore arrived at twenty-one, when it should be divided into three equal parts, one to be given to Montefiore, and the balance to be kept until Moultrie arrived at twenty-one, when he should have half, and the balance to be kept until Rynear became twenty-one.

The balance of the estate might be continued in business by his executors as long as it might be considered perfectly safe to do so, for terms of three years, and should pay an interest of seven per cent. clear profit, payable monthly. Of this interest he gave his wife, for her own and the support of the said Flora and such other children as might be born, $100 00 per month, and for the support of his three sons, $75 00 per month. The codicil raised the amount to his wife $50 00 per month, and to his sons $25 00 per month, making, in all, a monthly sum of $250 00.

The residue of the interest and profits to be invested as fast as received for accumulation, and so with any part which may be withdrawn from business until January 1, 1870, when the whole of that part was to be divided between all his children equally. To this will his wife, Sarah, was appointed executrix, and his brother Isaac and brother-in-law, A. J. Brady, and friend, Hervey Hall, and his three sons, as they became twenty-one, executors.

The testator died in 1854, and his estate consisted of real estate, $200,000 00; one-half interest in mercantile house of Hall & Moses, at Columbus, and Hall, Moses & Roberts, at Montgomery, the assets of which were of the value of $300,-000 00 over and above liabilities; also, real estate in Georgia, $100,000 00, and personal property and cash, $50,000 00.

The will was proven, and said Isaac I. qualified and took the burden of administering the estate. It is charged that he

received all the estate, and after paying all the debts, there was $250,000 00 in his hands to be paid the legatees; that the said Isaac continued said mercantile business for ...... years and received large profits; that he sold divers parcels of real estate; that the interest of said testator, when withdrawn from business, was worth $100,000 00; that the executor made no return, but managed the estate as his own, and has made large profits by trade and speculation; that the executor has not paid over the $20,000 00 to any persons to hold, as directed by the will, but has kept it in his own hands and used it as his own; that, in settling up the Montgomery interest with Hervey Hall, the surviving partner of Hall & Moses, the said executor himself became the purchaser of said interest, and gave his notes to Hall for $30,000 00 in payment, and afterwards received his said notes from Hall in settlement of the portion of his testator in the concern at Montgomery; that said executor thereby became indebted to the estate in the amount of said notes; that, afterwards, he sold, or pretended to sell, the interest so obtained by him to Wyman, Moses & Company, for a large profit, to-wit: $20,000 00, and received in payment the notes of said purchasers.

That the executor pretended that an amount of said notes received from Wyman, Moses & Company equal to the amount of his own notes received by him from Hervey Hall, were the property of the estate, but that the balance of the notes of Wyman, Moses & Company were his own property, and having thus disposed of the interest of his testator in the Montgomery concern, he pretended, during the late war, that the estate was in great danger of losing the claim on Wyman, Moses & Company, and in order to save it, it was necessary to receive Confederate money in payment, although the claim existed before the war. But the executor did not receive such money in payment from said Wyman, Moses & Company of the notes belonging to him, and held them after the war. So complainants say the interest of the testator in the Montgomery concern was lost to the estate by the mismanage-

Moses *et al. vs.* Moses.

ment and illegal actings and doings of defendant, and that he ought to account for the value of the same.

The claimants pray for a discovery and account. Montefiore and Moultrie claim each one-third of the $20,000 00, and each claim one-sixth of the residue of the estate.

The defendant answered, giving an account of each item of the assets which came to his hand, substantially, as follows:

The estate consisted of a house and lot, with furniture, in New York, and also several unimproved lots in New York. The balance of the estate consisted of the one-half interest in the firm of Hall & Moses of Columbus. The house and lot was given by the will to the wife and children during life, and the furniture to wife and children. The unimproved lots had not been disposed of but were turned over to the heirs and they have sold and divided them amongst themselves, leaving a small balance of $511 66 of personal property in New York, in the hands of the executor, which he has administered in New York.

The assets of Hall & Moses consisted of the stock in trade, and notes and accounts in Columbus of the value of $106,-264 15, which includes the assets of Jacob I. Moses & Company; one-half interest in the firm of Hall, Moses & Roberts, in Montgomery, of the value of $34,932 05; certain real estate in Girard and Columbus. At the death of Jacob I. Moses, Mr. Hall, as surviving partner of the firm of Hall & Moses, took charge of the assets of Hall & Moses, including the real estate and interest in Montgomery, and retained and managed the same until the division which was made in January, 1860.

The share of Jacob I. Moses was not continued in business, not only because the executor did not think proper to do so, but Mr. Hall positively refused to allow it to be done, and the firm was dissolved by the death of said Jacob I. On the 1st of January, 1855, a balance sheet was struck which shows the assets, of every kind, belonging to Hall & Moses, and the nominal value of these assets, giving the cost of property purchased by the firm, and the amount due on the notes and ac-

counts due the firm, and the amount of capital invested in the firm of Hall, Moses & Roberts. A copy of this balance sheet is set out, which is correct. The nominal value of the assets is $208,515 94.

After deducting the capital in Hall, Moses & Roberts, and the real and personal property, which is otherwise accounted for, the individual accounts of the partners, the expense account, charges account and some bank bills, which were worthless, there remained of available assets for division, supposing every dollar due the firm was collected without expense, $136,823 21, one-half of which belonged to Jacob I. Moses.

The stock of goods was sold by the survivor to a new firm, consisting of the said Hall, William A. Beach, Jacob P. Hendricks and the defendant. The amount it sold for was $66,-762 90, and this was its value. It was understood between Mr. Hall, as survivor, and defendant, that it should be the special business of defendant to settle up the affairs of Hall & Moses, and bring them to such a condition that a division could be made of the assets.

The debts due by Hall & Moses amounted to $93,491 82. The amount due the firm upon open accounts, $87,501 57, and by note, nearly $70,000 00. These notes and accounts were the accumulations of many years' business, and were due, perhaps, by three thousand different persons, in various amounts, scattered over portions of Georgia and Alabama.

It required great labor and vigilance to pay off the debts and collect the notes and accounts, and it was not until 1860 that defendant could get the assets in a condition to be divided. On the 1st of October, 1860, a settlement was had with H. Hall, as survivor, and defendant then took charge of the half interest belonging to Jacob I. Moses, except the real estate, which was held in common.

Previous to this division, defendant had none of the assets of Hall & Moses in his hands as executor, and all payments of legacies and debts made by defendant, as executor, in New York, and by A. J. Brady, who first qualified in Georgia,

were made through H. Hall, survivor, and charged against the interest of Jacob I. Moses.

The amounts so paid by Brady and defendant, as executors, were included in the settlement with Mr. Hall.

This defendant, as executor, in New York, has made returns to the Surrogate, and has fully accounted for all that came into his hands as such.

Defendant gives a statement of the amount of the assets received from H. Hall, survivor, which does not include the real estate, but does include the rents up to the settlement, as follows:

| | | |
|---|---:|---:|
| The account of Jacob I. Moses, on books of Hall & Moses..$ | 6,993 | 12 |
| Amount paid A. J. Brady, executor........................ ......... | 24,271 | 71 |
| Amount paid Isaac I. Moses, executor in New York.......... | 11,603 | 72 |
| Sundry notes, of which the names of parties and amounts are given........ ....... .............. ... ...........…..….…..... | 49,806 | 40 |
| Note of Isaac I. Moses......................................….......... | 30,000 | 00 |
| Deposit in Bank of Columbus, to purchase stock and stock in bank...................................................... ......... | 5,086 | 25 |
| Gas light stock.............. ..... ...........….....................…......... | 1,200 | 00 |
| Cash, September 1, 1860 ...... ......... ........ .......…......•.....•. | 856 | 95 |

Making the whole amount........... ........................……....$128,918 15

This amount, however, is $888 90 more than the share of Jacob I. Moses, upon a calculation of the interest due on the notes taken in the settlement, so that the actual amount received on the share of said Jacob I., exclusive of the real estate, is $128,029 25.

The real estate is set out and described, except a few small parcels sold by H. Hall, survivor, and included in the settlement. The value of the real estate, as set out in the balance sheet, except some lots in Girard, not valued, is $12,912 28. Certain other real and personal estate and stock, contained in said balance sheet of Hall & Moses, amounting to $6,712 87, a list of which is not set out, was sold by H. Hall, survivor, (except two negroes, one of whom died and the other was set free by the will,) and is included in the settlement.

The answer then goes on to explain and follow up each item of property received and to account for the same.

The whole amount of notes collected in Confederate money (except from the Montgomery concern, which is specially accounted for,) is $6,402 10. As to the note of Isaac I. Moses for $30,000 00, the defendant says: Hall & Moses formed a partnership with J. W. Roberts, in Montgomery, under the name of Hall, Moses & Roberts. Hall & Moses furnished the capital, which was $30,000 00, and Roberts was to attend to the business, and the profits to be equally divided between Hall and Moses and Roberts. This partnership had not been profitable, nothing having been received by Hall & Moses. On the 1st of January, 1855, a balance sheet was made, showing the nominal amount of the assets $116,245 95, and the liabilities $50,916 19, leaving the capital $65,328 76. Hall & Moses had drawn nothing, whilst Roberts had drawn all his expenses, and had thus nearly received all his share of the profits.

After the death of Jacob I. Moses, and after this balance sheet was made out, Mr. Hall, as survivor, made the following agreement with Roberts: It was agreed that the share of profits to which Hall & Moses were entitled was $30,000 00, which, added to the capital furnished by them, would make their interest in the concern $60,000 00, and proper entries were made on the books of Hall, Moses & Roberts.

It was the desire of Mr. Hall and defendant to realize as much as possible from this interest, and for that purpose, he bought one-half interest of H. Hall, survivor, in the firm of Hall, Moses & Roberts, at the price of $30,000 00.

This sum was fixed because it was the amount of the interest of Jacob I. Moses, and it was the intention of both Mr. Hall and defendant that the half thus purchased was the half belonging to the said Jacob I. The true value of this interest was not $30,000 00, and was not more than $17,000, and it would not have brought more than that sum in the market if sold. This defendant hoped, by good management, that he could realize $30,000 after extricating the firm from its then embarrassed condition, and he desired that the estate of Jacob I. should reap the benefits of his efforts. Accordingly

he took this interest from Mr. Hall at said price with the understanding that this amount was to remain at interest until it became convenient to pay it. This defendant was not at the time able to pay it, nor was he even worth the amount. From the date of this transaction the new firm of Hall, Moses & Roberts paid to Hall & Moses the interest upon this sum, which Mr. Hall accounted for in the settlement.

In April, 1859, after having succeeded in placing the firm upon a good basis, Mr. Hall and defendant determined to sell out the entire interest in this firm to Wyman, Moses & Company. This last firm consisted of a brother of defendant, one Wyman and Mr. Roberts, defendant having no interest in it directly or indirectly.

The terms of sale were, that Wyman, Moses & Company gave their notes to defendant for $40,000 00 in notes of $1,656 25 each, payable in New York every ninety days from July, 1859, which includes interest from July, 1859, to the time the notes became due. These notes were secured by mortgage upon the stock and also upon real estate worth more than the amount of the notes. In the settlement with Mr. Hall, the defendant received the note for $30,000 00 given by him, as before stated, as the share of Jacob I. Moses in the firm of Hall, Moses & Roberts, but Mr. Hall still held this note at the time of sale to Wyman, Moses & Company. As soon as this settlement was made this defendant determined to substitute an equal amount of the notes of Wyman, Moses & Company for this $30,000, and he did, in October, 1860, transfer to himself, as executor, enough of the notes of Wyman, Moses & Company which first came due as would make the amount. Some of these notes had then been paid to Hall & Moses, and he took the note of Hall, Moses & Company for the amount paid, to-wit: $4,711 89, in lieu of the money.

In 1862, the city of Montgomery was threatened, and this defendant feared, would be attacked by the army and navy of the United States. Supposing a capture of the city would greatly endanger the debt due by Wyman, Moses & Company, the defendant thought it prudent to collect it in Confederate

money rather than risk the chances of collection after the war in current funds. At that time Confederate bonds of a certain kind were being readily sold in England for eighty cents on the dollar in gold, and it was the purpose of defendant to obtain such bonds and send them to England for sale. He arranged with Wyman, Moses & Company to receive such bonds in payment of their notes. Finding that they could obtain bonds of the Alabama and Florida Railroad Company he proposed to receive $4,000 00 in them, and did receive them. This company was then solvent, but the results of the war left them insolvent. Wyman, Moses & Company paid $25,000 in such Confederate bonds, which, with the $4,000, paid off the notes held by defendant, as executor. After receiving them he made diligent efforts to get the bonds to England, but was not able to do so. He then determined to convert as many of them as possible into other securities, and finding an opportunity to do so he exchanged $10,000 00 for notes on individuals made before the war, and all perfectly good and solvent. In this whole matter he says he acted in the most perfect good faith, and as a prudent man would do in like circumstances. In proof of this, he says that Mr. Hall, who is a man of great prudence and business skill, pursued identically the same course in reference to his own interest in this firm, and lost the whole amount.

This defendant has realized from the Montgomery interest,
in interest to 1859..................................................$10,408 00
Paid the legatees cash ...................................... 16,921 00
                                                             ————————
                                                             $27,329 00
and has on hand $12,000 00 in what were perfectly good assets, and $10,000 00 in Confederate bonds.

In 1862, Montefiore J. Moses became twenty-one years of age and had qualified as executor. There was then due him as his one-third of the special legacy, $11,378 19. The defendant turned over to him, as co-executor, assets amounting to $21,378 19, which was $10,000 00 more than his part of the legacy. The balance is a charge against his interest in the residue. Besides this, defendant paid him $5,000 00 in Con-

federate bonds, in June, 1863, and took his receipt. The said Montefiore J. has accounted for the same as such co-executor.

In 1865, when Moultrie came of age, he was entitled to $11,939 00 as his part of said special legacy, and $1,200 00 on account of monthly legacy. Defendant then turned over to him the bonds of R. J. Moses, which were part of the assets of the estate, amounting to $16,280 00, and took his note for $3,141 00 for balance which he claims as an offset and payment to him.

No returns were made by defendant until 1865. The reason why none were made was because, prior to the settlement in 1860, H. Hall held all the assets. In 1861, and before the time when by law he would have made a return, the war commenced, and, as all the legatees except two resided in the State of New York, he feared by making his return to call attention to the estate in his hands belonging to these non-residents and subject it to sequestration. But he did keep a full account on his books, and as soon as the war ended he caused a full return to be made embracing all the time from 1860.

Regular returns have been made since. Defendant advanced to Montefiore and Moultrie Moses large sums of money, to enable them to procure the necessaries of life, from time to time. For this money he now holds against them as follows

AGAINST M. J. MOSES.

| | | |
|---|---|---|
| Note dated April, 1861, principal.................................................$ | 86 | 00 |
| Note dated June, 1861, principal.......................................... | 100 | 00 |
| Note dated November, 1862, principal.................................... | 100 | 00 |
| Receipt October, 1864, principal............................................ | 3,000 | 00 |
| Receipt October, 1864, principal ........................................... | 500 | 00 |
| Account in 1864........................................................................ | 7,860 | 00 |
| | $11,646 | 00 |

AGAINST MOULTRIE.

| | | |
|---|---|---|
| Account for 1864 for..............................................................$4,750 | | 00 |
| Note dated November 13, 1860............................................ | 100 | 00 |
| Draft, favor R. J. Moses....................................................... | 1,120 | 00 |
| Receipt October, 1864............................................................ | 3,000 | 00 |
| Due bill February, 1863......................................................... | 275 | 00 |
| | $9,245 | 00 |

These sums are all claims which he holds against them, and he claims the same as set-offs against them, and if, upon final trial, they or either of them should be found indebted to this defendant over and above their shares, he prays a decree against them for the balance.

The bill and answer were referred to a master to take an account and report what amount, if anything, was due from the executor to the complainants. At the hearing before the master, no testimony was introduced except the bill, the answer of defendant, the returns to the Ordinary, and the various vouchers and documents connected with the same. The master reported as follows :

1st. The testator died in December, 1854.

2d. The most of his estate consisted of his interest in the partnership effects of Hall & Moses.

3d. The firm was composed of Hervey Hall and Jacob I. Moses.

4th. Hall, as surviving partner, closed up the partnership business in the manner and at the time set forth in the answer, and no settlement was made until October 1, 1860.

5th. The amount received from Hall, survivor, was $128,-029 25, and this is accepted in the calculations as the proper amount with which to charge defendant.

6th. No errors are found as mere matters of calculation in the returns of defendant as executor.

7th. All the items of credit claimed by defendant are allowed him, except those specially stated in the account.

8th. The amount due the executor on the 24th of January, 1872, is $512 81.

The following items charged to the estate by the executor, have been deducted by the master :

1st. Commissions allowed the executor by the Ordinary during the years in which he made no returns: $4,873 64, and interest on the same from March 4, 1867, $1,791 03; total, $6,664 67.

2d. Counsel fees charged as paid for filing the bill, $150 00.

3d. Charges the defendant with the amount of Confederate

bonds on hand, amounting to $10,000 00, but without interest.

4th. Charges the defendant with the sum of $100 00 as having been paid to Bivins for making out accounts.

The total amounts charged by the master against the defendant is.............................................................................$16,914 67

Deduct balance due him...........................................................   512 81

And he finds the executor to be due the estate in the sum of.$16,401 86

5th. The complainant contends that the defendant is now chargeable with the entire amount of the $30,000 00, that being the interest in the firm of Hall, Moses & Roberts. The master refuses to charge him with the whole amount, but charges him with the $10,000 00 of Confederate bonds, which investment was made a considerable time before he had any authority to make it.

6th. Allows the executor the charge of $500 00 paid Peabody & Brannon for aiding in managing the estate.

7th. Allows the defendant the credits for the amounts turnturned over to M. J. Moses, co-executor.

8th. Finds that the executor is entitled to a set-off against Moultrie Moses of $7,796 18.

9th. And against Montefiore Moses, $2,886 41.

10th. And that the specific legacies due the complainants have been paid.

Both complainants and defendants filed objections to the report. Complainants' objections are as follows:

1st. They except to the report as being inaccurate in the statement that most of the estate consisted in the interest in the firm of Hall & Moses.

2d. They except to the statement that Hall, as survivor, closed up the business.

3d. They except to that part of the report which accepts $128,029 25 as the basis, and claim that Hall was indebted to the estate in a much larger amount.

4th. They except because it rejects as a basis of its calcula-

tions the actual assets existing at the testator's death, as shown by the answer and exhibits.

5th. They except so far as it recognizes the so-called inventory in the returns made to the Ordinary in January, 1865, as being an inventory.

6th. They except so far as it recognizes all or any of the notes as set forth in the returns as the assets of the estate.

7th. They except so far as it expressly or impliedly exonerates the defendant from any losses resulting from his lawless management and investment.

8th. They except so far as it either expressly or impliedly allows credits to defendant for anything but debts, legacies and expenses of administration paid and supported by vouchers.

9th They except to the allowance of counsel fees to Peabody & Brannon.

10th. They except so far as it exonerates defendant from liability for the amounts turned over to any co-executor; complainants say that he still remains liable with such co-executor.

11th. They except so far as it expressly or impliedly frees defendant from interest for any portion of the time from the beginning of the year 1855 down to date.

Defendant excepts upon the following grounds:

1st. To the refusal of the master to allow the sum of $4,-873 64 for commissions, and to the charge of said master against defendant of said sum and $1,791 03 interest on same.

2d. To the refusal to allow as a credit the sum of $150 paid for counsel fees for defending bill.

3d. To the charging of defendant with $10,000 00 for Confederate bonds.

4th. To the refusal to allow extra compensation in closing up partnership business.

5th. To the refusal to allow as a credit the amount due by Moultrie Moses.

6th. To the refusal to allow defendant a reasonable sum for expenses in defending this bill.

At the trial term complainants filed an amendment to their

Moses *et al. vs.* Moses.

bill, which is a replication to and a denial of the facts and conclusions of the answer, and charges that the true amount to be charged against defendant is the one-half of the nominal amount of the assets of Hall & Moses, without respect to the amount actually received by him in the settlement with H. Hall, and giving a calculation based upon this to show how much is due by defendant, which amount is claimed to be $100,053 73, up to 1st July, 1872.

At the trial complainants offered in evidence a balance sheet bearing date April 29th, 1857, made out by defendant, and which was admitted to be a balance sheet of the firm of Hall & Moses at that time.

It was proved by John Peabody, who was introduced by complainant, that the service rendered by Peabody & Brannon to the defendant, was in preparing his returns as executor and in other matters pertaining to the management of the estate before bringing this suit, and were worth $500 00, and that the services of counsel on the part of defendant in defending this bill were worth $1,500 00, and $300 would be a fair compensation for the master.

The master's report shows that defendant produced and proved before him an order of the Judge of the Superior Court, authorizing investments in Confederate bonds, but that the investments were made prior to the obtainment of the order. The complainants admit these facts and that the proof of them was before the jury. The following is a copy of the balance sheet:

| | | |
|---|---|---|
| Stock as per books | | $211,295 33 |
| Error | $     87 49 | |
| Balance interest account | 11,036 82 | |
| Balance P. & L. account | 18,296 48 | |
| | | |
| | $29,400 79 | |
| Less balance charges account $5,405 25 | | |
| Less balance merchandise account  1,396 59 | | |
| | 6,801 84 | 22,598 95 |
| | | |
| | | $233,890 28 |

Moses *et al. vs.* Moses.

ASSETS.

| | | |
|---|---:|---:|
| Open accounts................................................$ | 3,426 16 | |
| Sundry accounts............................................... | 1,096 20 | |
| E. G. Dawson settled....................................... | 160 47 | |
| Oliver & Clements.......................................... | 6 50 | |
| St. Mary's Bank bills........................................ | 276 25 | |
| Expense account.............................................. | 4,037 09 | |
| Bills receivable............................................... | 17,026 58 | |
| | | $ 26,727 25 |
| Stocks.....................................................$ | 11,976·51 | |
| Real and personal estate...................... | 19,170 56 | |
| Investments.................................................. | 21,896 02 | |
| Cash on hand .............................................. | 2,347 30 | |
| | | 55,390 39 |
| H. Hall's account ...............................$104,928 85 | | |
| Jacob I. Moses' account.............$ 6,093 12 | | |
| Executor I. I. Moses.................. 37,164 54 | | |
| A. J. Brady................................. 4,272 77 | | |
| | 47,530 43 | |
| | | 152,459 28 |
| | | $234,476 92 |
| Less unpaid debts ...................................................... | | 582 64 |
| | | $233,894 28 |

The remainder of the evidence is contained in the bill, answer, exhibits and master's report. The return showed a petition by Isaac I. Moses, executor, to the Ordinary, giving reasons for not making returns and asking for an allowance of commissions, and the order of the Ordinary, March 4, 1867, allowing $4,873 64 for such commissions. The exceptions to the master's report were submitted to the jury. The Court charged:

1st. It admitted that the specific legacies were paid, and on that point there was no controversy. It was contended by complainant that the basis taken by the master in making his report was not correct.

2d. It was the duty of an executor of a deceased partner to make some kind of inventory of the interest of the deceased partner in the partnership, and the interest of the deceased would be his share after the payment of all the debts due by the partnership. The executor was not entitled to have pos-

Moses *et al. vs.* Moses.

session of the assets of the partnership, but to have an account from the survivor and payment from him of the amount found to be due upon final settlement of the partnership affairs. Under the will, the executor was invested with large discretion, and he might himself, with others, buy the interest of the deceased in the partnership, and if the interest thus bought by him was purchased in good faith, and at a fair price, then the transaction would be valid and binding on the estate. If the price of the interest of the deceased was fair and *bona fide*, as charged and as taken by the master as the basis of calculation, the jury might also take it as a basis, but if the sum was not fair, or if the transaction was not in good faith, then the jury might take such a basis as the proof showed was correct. It was contended that the executor was not entitled to charge commissions, because he had failed to make regular returns. He thereby forfeited his commissions, but he might apply to the Ordinary to set aside this forfeiture and allow them, and if he did so, and the Ordinary set aside the forfeiture and allowed them, such allowance was *prima facie* evidence that the commissions were properly allowed, but it was only presumptive, and it was for the jury, from the evidence, to determine whether the commissions should be allowed or rejected. Further, that an executor in a proper case would be entitled to have allowed him a reasonable amount for counsel fees. He is only allowed such in a proper case, and the amount to be allowed will depend upon the condition and circumstances attending each particular case. The jury will look to the evidence in this case and the circumstances attending the administration of it, and from these they will determine whether the defendant shall be allowed counsel fees, and if so, what amount, allowing only a reasonable sum.

3d. If one of the sons of deceased qualified as executor, and if the defendant, as executor, turned over to his co-executor assets or property belonging to the estate to be administered by him as such co-executor, and did so in good faith and without any reason to apprehend that it would be wasted or lost by such co-executor, the executor, so turning over the property,

would be discharged from liability therefor; but if it was not done in good faith, or if it was wasted by his privity, then he would be liable for the loss or waste.

4th. Under the will, the executor had the right to withdraw the interest of the deceased in the Montgomery partnership for the purpose of investment, and he might withdraw it by a sale thereof to himself or to himself and others, if he took it at a fair price and in good faith and for the benefit of the estate; if he withdrew in this manner, he might afterwards change the investment into the notes of other parties, and might change them into Confederate bonds and notes on individuals, without a violation of duty, if he, in this transaction, acted in good faith, and if his conduct was such as would characterize a prudent man under similar circumstances. But if he did not act in good faith, or if his conduct in these matters was not characterized by prudence, if loss occurred, he must sustain the loss and not the estate.

5th. They should apply these principles of law and determine from the testimony, whether said defendant was indebted to said estate, and if so, how much, or whether the estate was indebted to him, if so, how much; and further, that they might say in the verdict what disposition should be made of the property in the hands of the executor unadministered, and whether any of the legatees, complainants, were indebted to the defendant, and if so, in what sum, and that if any of them were indebted to defendant they might decree that such sum be set off against any part of said estate which might be due or become due such legatee.

6th. It was admitted that there were six children of testator, five of whom were complainants. The Court charged the jury further, that if they should find that defendant was indebted to the estate, or had any property belonging to the estate unadministered, that the same should be divided into six equal parts, and one part thereof should be decreed to each of the five complainants, the children of testator, the shares aforesaid to be subject to the right of set-off as above set out in the charge.

Moses *et al. vs.* Moses.

Under this charge the jury rendered the following decree:

1st. We decree in favor of the defendant and against Mrs. Davega and her husband.

2d. We further find and decree that the defendant be allowed the credit of $4,873 64 for his commissions as of March 7th, 1867.

3d. We further find and decree that said defendant be allowed, by a credit, the amount of $10,000 00 for the Confederate bonds on hand.

4th. We further find and decree that the said defendant be allowed a credit for the $150 00 paid Mr. Benning and Mr. Blandford as fees for defending this bill.

5th. We further find and decree that the said defendant be allowed, as a credit, the amount of $5,000 00 turned over to Montefiore J. Moses, the co-executor.

6th. These credits being allowed, we find and decree in favor of defendant in the sum of $512 81 as the amount due him as executor, 24th January, 1872.

7th. We further find and decree that the said defendant be allowed the amount of $1,500 00 as counsel fees for defending this bill, which sum includes the credit of $150 00 above allowed.

8th. We further find and decree that the property and effects in the hands of the defendant, as set forth in the master's report in this case, be sold by the defendant, and that he retain, out of the proceeds of said sale, the balance of amount of counsel fees allowed, to-wit: $1,350 00, and also the amount of $512 81 due him, and that the balance of the proceeds of said sale be divided into six equal portions.

9th. We further find and decree that each of the five complainants, to-wit: Montefiore, William Moultrie, Flora O'Hoinguer, formerly Flora Moses, Felix and Jacob Moses, minors, do receive one portion of said proceeds, and that the defendant do recover of Montefiore J. Moses the amount of $2,186 41 to be set off against his share, and that defendant do recover of William Moultrie Moses $7,796 18, to be set off against his share.

Complainants moved for a new trial on the following grounds:

1st. Because the jury have not returned a verdict on all and each of the exceptions to the master's report, *seriatim*, as required by law.

2d. Because the jury have not returned any verdict on the first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, eleventh and twelfth exceptions.

3d. Because the verdict is wrong and contrary to law in finding against the tenth exception filed by complainants, and allowing defendant a credit of $5,000 00 turned over to Montefiore J. Moses, co-executor.

4th. Because the verdict is wrong, and contrary to evidence and law and the principles of justice and equity in finding in favor of the defendant on the first exception filed by him, and allowing him the sum of $4,873 64 for commissions, and also in finding in favor of defendant on the third exception filed by him, and allowing him a credit for the $150 00 paid Mr. Benning and Mr. Blandford as fees for defending this bill, and also in finding in favor of defendant on the third exception filed by him, and allowing him, as a credit, the $10,000 00 for the Confederate bonds, and also in finding in favor of defendant on the fifth exception filed by him, and in finding that he should recover of the complainant, William Moultrie Moses, the amount of $7,796 18; and also in finding in favor of defendant on the sixth exception filed by him, and decreeing that he should be allowed the amount of $1,500 00 for counsel fees; and also that he should retain the same out of the proceeds of the sale of the property in his hands.

5th. That the verdict is wrong and against law and evidence in allowing defendant $512 81, to be retained by him.

6th. That the verdict is wrong and against evidence in decreeing that the defendant should recover of Montefiore J. Moses $2,186 41.

7th. That the verdict and decree is wrong and against law and evidence, in directing the balance of the proceeds of the sale to be divided into six equal parts, one whereof to be paid

to each of the five complainants, because two of the complainants, to-wit: Montefiore and Moultrie, have received considerable payments, and Flora has received $60 00, and the two minors nothing.

8th. Because the verdict, as a whole, is against evidence and the weight of evidence.

9th. Because the verdict, as a whole, is contrary to law and the principles of justice and equity.

10th. Because the Court erred in charging the jury against the third and fourth exception of complainants.

11th. Because the Court erred in the construction of the following clause of the will: "The residue of this interest and the profits accruing every three years from my business shall be invested as fast as received for accumulation, and so with any part or all of my estate, when withdrawn from my business, until January 1, 1870;" and in holding and charging the jury that said clause did not narrow or restrict the executor's discretion in making and changing investments, and that he had the same license and latitude of discretion in that regard as if said clause were not in the will.

12th. Because the Court erred in charging the jury that the executor was protected from responsibility for losses, if his alleged investments and changes of investments were such as an ordinarily prudent man might have made in his own business, and that there was nothing in the will or law to make the investments an exception to the rule.

13th. Because the Court erred in charging the jury that, although the defendant became the purchaser, individually, from the surviving partner, still, he was at liberty to exonerate himself from that debt by substituting other debts, stocks or property therefor.

14th. Because the Court erred in charging that the defendant was exonerated from liability as to that portion turned over to his co-executor.

15th. Because the Court erred in that part of the charge beginning with the words, "that, under the will, the executor

was entrusted with a large discretion," and including "basis, as the proof showed was correct."

16th. Because the Court erred in charging that the order of the Ordinary setting aside the forfeiture of commissions was *prima facie* evidence that they were properly allowed.

17th. Because the Court erred in that portion of the charge beginning with, "that, under the will, the executor had the right to withdraw the interest in the Montgomery partnership," and including, "and if losses accrue, he must sustain the loss and not the estate."

18th. Also, to the direction to divide the remainder into six equal parts, and that one part thereof should be decreed to each of the five complainants, because it went on the assumption that equal payments had been made to the complainants, whereas, the contrary is true.

The motion was overruled, and the complainants excepted upon each of the grounds aforesaid.

A. H. CHAPPELL; M. J. CRAWFORD, for plaintiffs in error.

HENRY L. BENNING; PEABODY & BRANNON, for defendant.

McCAY, Judge.

1. It is, without question, the law that an executor or administrator should take some notice in his inventory of the interest of the deceased in any partnership of which he was a member. He cannot, it is true, in his inventory ordinarily do more than make an estimate, since the control of the assets, books, etc., is with the survivor. But it is his duty to mention, for the information of all concerned, that there is such an interest and give as definite a statement of its amount and nature as he can. If he fail to do this when he has the information, it is a mark of suspicion, and authorizes a keen and suspicious inquiry into his acts in the premises. But we do not see that this justifies us in assuming any arbitrary value

Moses *et al. vs.* Moses.

of the partnership assets. The balance sheet of a dissolved partnership, in which all assets are put down at their nominal value, and which is, in fact, but a summary of the books with no estimate even of the value of the stock, or debts owing, is a very unfair standard. It appears by the defendant's answer, that the stock on hand was sold for more than the balance sheet puts it, and no reasonable man who has the least experience of human affairs, can, for a moment, believe that such a lot of debts on three thousand persons could be collected without considerable losses and expenses. In justice to both sides, it is, in such cases, only fair to treat the balance sheet as a mere general guide. If there be a very marked and extraordinary discrepancy between that and the final settlement with the survivor, some explanation of the fact should appear, especially if the executor took no notice of the interest in his inventory.

2. We do not think the final settlement with the survivor was unreasonably delayed. Assets, such as are indicated in the balance sheet, with $93,000 00 of debts due from the concern, might very well require till 1860 to be put in condition for an intelligent and definite *final settlement*. It is to be noted that, before this final settlement was had, the survivor had paid over to the executors large sums. What took place in 1860 was the adjustment of the relations between the survivor and executor and the division of the assets on hand in kind, and we do not think it at all an unreasonable delay. In truth, it is fair diligence to get such a mass of assets in condition for a settlement in such a space of time. The amount actually received by the executor is all that he is to be charged with. It is true, if there be assets that he ought to have received, he is chargeable for neglect in not getting them. But it is for the complainants to show the existence of such assets. The executor, in his answer, declares that, on a final settlement between himself and the survivor, he received so much. Is there any *proof* that he received more, or that he ought to have received more? It is complained that Mr. Hall was not charged with interest; but this does not appear. We have only the final result. The mode by which the con-

dition of the affairs of the firm and of the relation of the survivor and executor to it was arrived at, does not appear. It was the duty of the executor to see to it that the settlement was a fair one. If he neglected to insist on all the rights of the estate, that was a breach of his sworn duty. But to charge him with such a breach, the fact of such failure should appear. We do not think the discrepancy between the balance sheet and the $128,000 00 actually received, is so great as to cast the burden of proof upon the executor.

3. We agree that there are various acts of the executor, in the management of these assets, that are suspicious and approach to the very verge of illegality. Were we sitting as arbitrators, or as a jury, to decide the questions between the parties, we are not prepared to say that we would have been satisfied with the *bona fides* of some of these manipulations; but as none of them were actually illegal, and as the good faith of the executor in each of them was a question for the jury, we cannot say the jury acted illegally in believing, from the evidence, in that good faith.

4. The legal title to the partnership assets was in the surviving partner. He had a right to sell, and the defendant a legal right to buy. The relation of each of them, as trustees, was, however, such as that their acts are to be closely scanned, and only to be sustained when they are clearly in good faith. So, as to the change of the notes. The defendant had a legal right to settle his own note. The change of it for the other notes, it was the duty of the jury to scan closely and to judge suspiciously. But if it was, in truth, fairly done, and, at the time, it was a prudent act for the estate, it was not *illegal*. So, also, of the investment in Confederate bonds. It would be very harsh to hold a man, situated as was the defendant, to any other rule than that indicated by the Judge in his charge, to-wit: the skill and prudence of prudent men in the same situation. It was impossible to get the funds to New York for investment, and the executor was driven to invest them here as prudently as possible. It appears that he kept regular books during the war of each of these transactions. These

Moses *et al. vs.* Moses.

books were open to inspection.  The whole investigation was upon the answer of the defendant, and we do not think the verdict of the jury is chargeable with prejudice or mistake in recognizing the good faith and honesty of the whole.  If the acts of an executor are *illegal*, his good faith will not protect him, but if he keep within the bounds of legality, his liability is a question of good faith, to be decided by the jury.

5. Previously to the Code, 1st January, 1863, we had no rule in this State requiring trustees to select any particular mode of investing funds in their hands.  It was their duty to invest them safely, prudently ; each case stood upon its own facts.  For this reason we think the investment in Confederate bonds, approved as it was by Judge Worrill, was not *illegal ;* that, too, was a question of *bona fides* and turned upon whether it was apparently a prudent investment at the time.

6. As we have said, we do not intend, by our judgment, to express our approval of the acts of the executor, nor to say that we, if we had original jurisdiction, would have done as this jury has.  But under our opinions of the nature of our jurisdiction we do not think this verdict is an abuse of the powers of the jury over the facts.  We recognize the right of the defendant to be allowed counsel fees for advice and assistance in his management of the estate, and we see no objection, even on a bill for accounts, if the rights of the complainants are complicated and conflicting so as to require the judgment of the Court to protect the trustee to allow fees.  But there is nothing of that here.  It was a simple question of account— a charge of *devastavit*—and there is no more propriety in charging the plaintiffs with the counsel fees of the defendant than in any other suit in which the plaintiff fails.  It would, we think, be a bad policy to put such an hindrance in the way of heirs or legatees seeking their rights, that they shall pay for counsel to aid the executor in resisting their charge of a *devastavit*.  But we will not grant a new trial on this ground. We shall simple direct the Court to put the defendant on

terms.   He must consent to give up this credit, or the verdict must be set aside.

Judgment affirmed on terms.